## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **ROCHAR JONES, as Administrator of the Estate of ROLAND PHILLIPS** | ) ) ) |
| **and** | ) ) |
| **ROCHAR JONES, as natural guardian and next of friend of AMANDA JONES** | ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) **CIVIL ACTION FILE NO:** ) ) |
| **AHMED HOLT, in his individual capacity; JAMIE CLARK, in his individual capacity; ANNETTIA TOBY, in her individual capacity; GEORGE IVEY, in his individual capacity; ERICA SWINT, in her individual capacity; SHANDRINA DIXON, in her individual capacity and; JOSEPH SALAD, in his individual capacity.** | ) ) ) ) ) ) ) ) |
| **Defendants.** | ) **Jury Trial** ) **Demanded** |

_____

## COMPLAINT FOR DAMAGES

COME NOW Rochar Jones, as Administrator of the Estate of Roland Phillips and Rochar Jones, as natural guardian and next of friend of Amanda Jones (hereinafter referred to as "Plaintiffs"), and, by and through undersigned counsel, hereby file this Complaint for Damages against Defendant Ahmed Holt, in his individual capacity, Defendant Jamie Clark, in his individual capacity, Defendant

Annettia Toby, in her individual capacity, Defendant George Ivey, in his individual capacity, Defendant Erica Swint, in her individual capacity, Defendant Shandrina Dixon, in her individual capacity, and Defendant Joseph Salad, in his individual capacity, respectfully showing the Court as follows:

## Preliminary Statement

1.

This is a civil action pursuant to 42 U.S.C. §1983 to redress deprivations, under color of state law, of Mr. Roland Phillips's clearly established civil rights secured by the Eighth Amendment and First Amendment to the United States Constitution. Claims are hereby filed pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988 for civil rights violations, unsafe prison conditions, failure to protect, deliberate indifference, retaliation, cruel and unusual punishment, and supervisory liability.

2.

This Court has original subject matter jurisdiction of the federal questions presented herein pursuant to 28 U.S.C. §§ 1331 and 1343. This Court also has jurisdiction pursuant to the provisions of 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

## Parties

3.

Plaintiff Rochar Jones is the Administrator of the Estate of Roland Phillips.

4.

Plaintiff Rochar Jones is also the mother and natural guardian of Amanda Jones, who was the surviving daughter of Mr. Roland Phillips (hereinafter referred to as "Mr. Phillips").

5.

Mr. Phillips was unmarried at the time of his death on June 28, 2023.

6.

Plaintiff brings these claims on behalf of Amanda Jones to recover for the wrongful death of Amanda Jones's father, Mr. Phillips, under Georgia's wrongful-death statutes which are incorporated into federal law under 42 U.S.C. §1988.

7.

Plaintiff as the Administrator of the Estate of Roland Phillips brings claims on behalf of Mr. Phillips's estate.

8.

Plaintiff seeks to recover for claims against Defendants arising under federal law. Plaintiff is a resident of Illinois and consents to this venue.

9.

Defendant Ahmed Holt, at all times relevant to this Complaint, was the Assistant Commissioner for the Facilities Division of the Georgia Department of Corrections and was acting in the course and scope of his employment and under

color of law. Defendant Ahmed Holt, (hereinafter referred to as "Defendant Holt")
is sued herein in his individual capacity for purposes of his actions and policies and
supervision and for establishing a policy or pattern of widespread constitutional
deprivations related to inmate classifications at Georgia prisons, which includes
Hancock State Prison.

10.

Defendant Holt is a Policy Maker for Georgia prisons, which includes
Hancock State Prison.

11.

Defendant Holt can be served at his place of employment.

12.

Defendant Jamie Clark, at all times relevant to this Complaint, was the
Director of Engineering and Construction Services for the Georgia Department of
Corrections and was acting in the course and scope of his employment and under
color of law. Defendant Jamie Clark (hereinafter referred to as "Defendant Clark")
is sued herein in his individual capacity for purposes of his actions and policies and
supervision of the maintenance of dilapidated Georgia prison facilities, which
includes Hancock State Prison.

13.

Defendant Clark is a Policy Maker for Georgia prisons, which includes Hancock State Prison.

14.

Defendant Clark can be served at his place of employment.

15.

Defendant Annettia Toby, at all times relevant to this Complaint, was the warden of Hancock State Prison and was acting in the course and scope of her employment and under the color of law. Defendant Annettia Toby, (hereinafter referred to as "Defendant Toby") is sued herein in her individual capacity for purposes of her actions and customs and supervision of law enforcement personnel under her control and for establishing a pattern of widespread constitutional deprivations at Hancock State Prison.

16.

Defendant Toby was a Policy Maker for Hancock State Prison

17.

Defendant Toby can be served at her residence or place of employment.

18.

Hancock State Prison receives some form of federal funding.

19.

Defendant George Ivey (hereinafter referred to as "Defendant Ivey") was at all relevant times an employee at Hancock State Prison and was acting under color of state law and was acting in the course and scope of his employment at the time the subject incidents occurred.

20.

Defendant Ivey was a Deputy Warden at Hancock State Prison and is sued for his personal participation in the subject incidents.

21.

Defendant Ivey is a resident of Georgia and can be served at his place of employment or residence.

22.

Defendant Erica Swint (hereinafter referred to as "Defendant Swint") was at all relevant times an employee at Hancock State Prison and was acting under color of state law and was acting in the course and scope of her employment at the time the subject incidents occurred.

23.

Defendant Swint was a Correctional Sergeant at Hancock State Prison and is sued for her personal participation in the subject incidents.

24.

Defendant Swint is a resident of Georgia and can be served at her place of employment or residence.

25.

Defendant Shandrina Dixon (hereinafter referred to as "Defendant Dixon") was at all relevant times an employee at Hancock State Prison and was acting under color of state law and was acting in the course and scope of her employment at the time the subject incidents occurred.

26.

Defendant Dixon was a Correctional Sergeant at Hancock State Prison and is sued for her personal participation in the subject incidents.

27.

Defendant Dixon is a resident of Georgia and can be served at her place of employment or residence.

28.

Defendant Swint's and Defendant Dixon's conduct in this Complaint are pled in the alternative, that is the conduct complained of was either committed by Defendant Swint or Defendant Dixon. Therefore, Defendant Swint and Defendant Dixon will be referred to as "Defendant Swint, or in the alternative Defendant Dixon."

29.

Defendant Joseph Salad (hereinafter referred to as "Defendant Salad") was at all relevant times an employee at Hancock State Prison and was acting under color of state law and was acting in the course and scope of his employment at the time the subject incidents occurred.

30.

Defendant Salad was a Correctional Sergeant at Hancock State Prison and is sued for his personal participation in the subject incidents.

31.

Defendant Salad is a resident of Georgia and can be served at his place of employment or residence.

32.

At all times mentioned in this Complaint, the Defendants acted jointly and in concert with each other. Each Defendant had the duty and the opportunity to protect Plaintiff from the unlawful actions of the other Defendants, but each Defendant failed and refused to perform such duty, thereby proximately causing the injuries herein complained of.

## **Jurisdiction & Venue**

33.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all incidents and or occurrences giving rise to this action occurred in this District,

some or all of the Defendants reside in this judicial district, and the events or omissions giving rise to these claims arose here.

34.

Defendants' conduct under color of state law proximately caused the deprivation of Mr. Phillips's federally protected rights, injuries, and wrongful death.

35.

Jurisdiction supporting a claim for attorney fees and costs is conferred by 42 U.S.C. §§ 1983, 1988, and the 14th 1st and 8th Amendments to the United States Constitution.

36.

This action has been brought within 2 years of the subject incident as well as the death of Mr. Phillips.

37.

This Court has personal jurisdiction over Defendant Holt.

38.

This Court has personal jurisdiction over Defendant Clark.

39.

This Court has personal jurisdiction over Defendant Toby.

40.

This Court has personal jurisdiction over Defendant Ivey.

41.

This Court has personal jurisdiction over Defendant Swint.

42.

This Court has personal jurisdiction over Defendant Dixon.

43.

This Court has personal jurisdiction over Defendant Salad.

## Facts Related to All Counts

44.

Mr. Phillips was in the custody of the Hancock State Prison serving a sentence in June of 2023.

45.

At the time of Mr. Phillips's death, Defendant Ivey was the deputy warden of security at Hancock State Prison

46.

At the time of Mr. Phillips's death, Defendant Salad was the night shift unit manager of administrative segregation.

47.

In the Segregated Housing zone that Mr. Phillips was in, almost all inmates were in single person dorms and were classified as higher tier inmates.

48.

Mr. Phillips had an extensive mental health history that caused him to hear voices, cut himself, and attempt to hang himself more than once.

49.

Before arriving at Hancock State Prison, Mr. Phillips had been at multiple GDC facilities including Augusta State Medical Prison and Phillips State Prison, and he had an extended history of mental health problems requiring him to spend much of his time in restrictive housing, one-on-one housing, and/or segregation.

50.

For the majority of Mr. Phillips's time in GDC facilities, he was placed in restrictive housing, one-on-one housing, and/or segregation housing due to his well-documented mental health issues and poor peer engagement.

51.

Mr. Phillips was diagnosed with Schizophrenia, Paranoia, Schizoaffective Disorder-Depressive Type, Depression, Mood disorders, PTSD, and Antisocial Personality Disorder, among other things.

52.

Mr. Phillips was prescribed Haloperidol, Effexor, and Remeron to help manage his diagnoses.

53.

However, Mr. Phillips was known for years to not take his medication for extended periods of time. Because of this and for Mr. Phillips's own safety, he was forcibly medicated with Haloperidol for years while in the GDC system.

54.

Mr. Phillips's providers at the prison noted that Mr. Phillips was at risk of injury because of his fearlessness of physical pain/injury/death and impulsivity.

55.

Providers at the prison also noted on multiple occasions, Mr. Phillips's inability to socialize with his peers.

56.

Providers noted that stressful dorm environments contributed to Mr. Phillips's mental problems.

57.

Providers noted that improved cell/dorm placement was a protective factor in Mr. Phillips's mental health.

58.

Providers in the past had noted that Mr. Phillips's paranoia and depression had limited Mr. Phillips's ability to function in a living environment as evidenced by his crisis placement and extended segregation placements.

59.

Mr. Phillips's providers have also previously indicated that he was unable to care for himself in such a way that presented as a life endangering situation and that his medical history supported a diagnosis of a chronic psychiatric condition that presented a high probability of deterioration that could result in a life endangering situation.

60.

Providers have also indicated that Mr. Phillips had a mental disorder which significantly impaired his judgment, behavior, and capacity to recognize reality or cope with the ordinary demands of life and by history will decompensate to present a substantial risk of imminent harm to himself.

61.

Mr. Phillips had told Defendant Ivey, Defendant Salad, and Defendant Swint, or in the alternative Defendant Dixon, multiple times of his aversion to having a roommate because of fears of his life being in danger.

62.

Mr. Phillips had also been pepper sprayed and physically restrained multiple times by officers due to his mental health disturbances and suicidal proclivities.

63.

Mr. Phillips's housing requirements and above described mental health history were well-known to Defendant Ivey, Defendant Salad, and Defendant Swint, or in the alternative Defendant Dixon.

64.

Mr. Phillips was also a victim of multiple sexual assaults during his time in prison and was physically attacked on multiple occasions.

65.

On one occasion, Mr. Phillips's prior dormmate broke his nose in an altercation.

66.

On another occasion, a dormmate stabbed Mr. Phillips with a sharpened makeshift weapon.

67.

Mr. Phillips's prior incidents of victimhood were well-known to Defendant Ivey, Defendant Salad, and Defendant Swint, or in the alternative Defendant Dixon.

68.

Leading up to Mr. Phillips's death, a violent, gang-affiliated, and mentally unstable inmate named Danny Garrison was placed into a segregated cell with Mr. Phillips.

69.

Inmate Garrison was at Hancock State Prison in the segregated housing zone because he previously and recently stabbed another inmate at Smith State Prison.

70.

Inmate Garrison was classified as a gang member in the GDC's classification system.

71.

According to public record, Inmate Garrison had been receiving psychiatric treatment or had been in a mental hospital since he was 13 years old.

72.

During this time, according to public record, Inmate Garrison was prescribed Remeron to treat his mental health issues.

73.

According to public record, Mr. Garrison was 18 when he was arrested for armed robbery, aggravated battery, aggravated assault with a deadly weapon, and possession of a firearm during the commission of a felony.

74.

According to public record, Inmate Garrison was placed into the GDC system after pleading guilty in 2016 to armed robbery, aggravated battery,

aggravated assault with a deadly weapon, and possession of a firearm during the commission of a felony.

75.

According to public record, during the above-described crimes, Inmate Garrison shot, assaulted, and robbed the victim.

76.

Mr. Garrison's violent and explosive proclivities were well-known to Defendant Ivey, Defendant Salad, and Defendant Swint, or in the alternative Defendant Dixon.

77.

However, in spite of knowledge of Mr. Phillips's housing requirements, mental health history, forced medication, and prior victimhood, as well as inmate Garrison's violent and explosive proclivities, Defendant Ivey and Defendant Swint, or in the alternative Defendant Dixon, placed Mr. Garrison in a cell with Mr. Phillips and were deliberately indifferent to the serious injury or death that was likely to result.

78.

Prior to being placed in Mr. Phillips's cell, Mr. Garrison had helped Mr. Phillips write a grievance after Mr. Phillips was pepper sprayed by Defendant Ivey.

79.

Inmate Garrison wrote a witness statement supporting Mr. Phillips's grievance regarding the pepper spray incident.

80.

After the grievance was issued, Defendant Ivey decided to put Inmate Garrison in a cell with Mr. Phillips.

81.

Defendant Ivey instructed Inmate Garrison to pack his property because he was moving to "next door with [Inmate Garrison's] buddy Roland Phillips."

82.

However, Mr. Garrison stated that he did not want to move because he did not "match up [with Phillips] in the system".

83.

Defendant Ivey told Inmate Garrison that he must be "cool" with Mr. Phillips because they had written statements together supporting a grievance concerning Defendant Ivey's previous conduct.

84.

Inmate Garrison then told Defendant Ivey that "this must be your way at getting back at us for filing the grievances on you".

85.

Defendant Ivey responded, "call it what you want to call it I'm going to get this cell one way or another."

86.

Defendant Ivey then told Inmate Garrison that he was wasting his time.

87.

Around the time that Inmate Garrison was told to move, Mr. Phillips was also told he was going to get a cellmate at some time early in the morning of June 26th, 2023.

88.

Mr. Phillips fervently objected to this housing change citing to the fact that he was not supposed to have a roommate per his housing restrictions and customs.

89.

Mr. Phillips also told prison officials not to put Mr. Garrison in the cell with him because he had been stabbed before by a cellmate.

90.

When Inmate Garrison was being transferred to the cell, Mr. Phillips had jammed his door with toothbrushes so Inmate Garrison couldn't come in.

91.

Mr. Phillips only agreed to allow Inmate Garrison to enter the cell after prison officials threatened to pepper spray him again.

92.

When inmate Garrison was placed in the cell, Defendant Swint, or in the alternative Defendant Dixon, found a makeshift weapon in Inmate Garrison's pocket -- a long sharpened screw.

93.

However, Defendant Swint, or in the alternative Defendant Dixon, did not search the rest of Inmate Garrison's belongings during the transfer, and those belongings contained at least two more homemade weapons, one of which was used to maim and kill Mr. Phillips.

94.

During the two-day span of Inmate Garrison's and Mr. Phillips's rooming together, they fought with each other and called for help from orderlies and Defendant Salad.

95.

Further, during this two-day span, Inmate Garrison's and Mr. Phillips's room was in disarray as if the two had been fighting.

96.

Further, during this two day span, Inmate Garrison was high on methamphetamines and displayed obvious signs this high to Defendant Salad, such as increased energy and paranoia.

97.

During one morning during this two-day span, both Inmate Garrison and Mr. Phillips begged Defendant Salad to be separated because they feared the other would cause harm or kill them.

98.

In response, Defendant Salad closed the flap and walked away without separating Mr. Phillips and Inmate Garrison.

99.

Mr. Phillips was attacked and killed in the morning of June 28th 2023 in his dorm after inmate Danny Garrison was placed into Mr. Phillips's cell.

100.

There were approximately 16 stab wounds over Mr. Phillips's body.

101.

After the stabbing, in order to calm Inmate Garrison from his violent rage, a doctor ordered Haldol shots.

**Additional Facts Related to Uncontrolled Violence at Hancock State Prison caused by a Failure to Control Contraband and Investigate Violence- Count VI (Defendant Toby)**

Uncontrolled Violence at Hancock State Prison:

102.

There were many violent homicides at Hancock State Prison leading up to Mr. Phillips's death:

a. Cesar Arnold Pastrana Morales, 33; March 13, 2020, stab wound of the chest. Incident report shows five other inmates involved in the incident;

b. Rashad Bolton, 29; Jan. 4, 2021, puncture wound to the chest with sharp object;

c. Dwayne Zackery Jr., 22; Feb. 12, 2021, stab wound to the chest with homemade knife;

d. Charles Tristen James McKee, 24; May 23, 2022, stabbed. Incident report shows five other inmates directly involved. A lawsuit alleges he was placed in a dorm with known gang members who were hostile to LGBTQ inmates. Lawsuit names Annettia Toby and George Ivey as defendants;

e. Terry Lee Bishop, 49; Oct. 18, 2022, blunt force trauma, acute toxicity of methamphetamine, acute toxicity of cannabinoids;

f. Norman Samples, 59; Dec. 27, 2022, blunt force injuries of the head and torso.

103.

Along with homicides, inmate-on-inmate violence was the norm or something close to it at Hancock State Prison leading up to Mr. Phillips's death:

    a. On May 3, 2023, an inmate-on-inmate assault occurred in the dormitory with a makeshift weapon, leading to an ambulance transport. This incident was not forwarded for investigation and involved Defendants Dixon and Salad.

    b. On May 6, 2023, an inmate-on-inmate assault occurred in the dormitory, leading to an ambulance transport. This incident was not forwarded for investigation.

    c. On May 16, 2023, an inmate-on-inmate assault occurred in the dormitory with a makeshift weapon, leading to an ambulance transport. This incident was not forwarded for investigation.

    d. On May 21, 2023, an inmate-on-inmate assault occurred in the dormitory, leading to an ambulance transport. This incident was not forwarded for investigation and involved Defendant Ivey.

104.

On May 22, 2022, following evening chow, an inmate was beaten and stabbed to death by other inmates at Hancock State Prison. According to a witness, the day before the homicide, the victim repeatedly asked to be moved because of

threats on his life. Another inmate who attempted to help the victim was also attacked.

105.

Upon information and belief, before Mr. Phillips's homicide, in the same dorm, two inmates who shared a room together had told the officer, "Man, we need to get out the room.  We're having problems" before leading to a massive beating requiring medical attention. In this case, the pleas for separation were ignored.


Failures to Investigate Violence- Count VI (Defendant Toby):

106.

Hancock State Prison, as a result of the supervision, custom, and practices of Defendant Toby, had inadequate systems for identifying, investigating, and preventing violence.

107.

Given the amount of violence at Hancock State Prison, procedures to identify dangerous circumstances and investigate misconduct are critical.

108.

Hancock State Prison, as a result of the supervision, custom, and practices of Defendant Toby did not meaningfully investigate the root causes of violence in the prison.

109.

Hancock State Prison, as a result of the supervision, custom, and practices of Defendant Toby does not use quality investigations to identify dangerous situations and avoid violence.

110.

After an incident of serious violence occurs or when correctional staff are alerted to a potential for serious violence, sound correctional practice includes a thorough investigation to identify the source of the violence, determine what led to the violence or threats, and identify corrective actions. As seen above, many acts of violence were not referred for further investigation.

111.

Corrective actions may include increasing staffing, addressing blind-spots, counseling staff to improve the quality of security rounds, re-balancing the mix of different gangs on a housing zone, and identifying the source of involved contraband. Such was not conducted.

112.

Without such investigations and corrective actions, staff cannot adequately identify or respond to patterns of violence and prevent it from recurring.


Failures to Control Contraband- Count VI (Defendant Toby):

113.

Leading up to Mr. Phillips's homicide, contraband was widespread at Hancock
State Prison:

a. On April 24, 2023, a package of meth was mailed to the facility. This
   incident was not forwarded for investigation

b. On May 3, 2023, an inmate was assaulted and bleeding all over, but no
   weapon was recovered by officers. This incident was not forwarded for
   investigation

c. On May 16, 2023, a homemade weapon sharpened to a point, a cellphone,
   and a leafy substance were found at the facility. This incident was not
   forwarded for investigation

d. On May 19, 2023, a Hancock State Prison guard was taken into custody by
   Hancock County Sheriff Department for crossing the guard line and
   attempting to distribute contraband into the facility.

e. On May 25, 2023, 51 bags of tobacco weighing 18,470 grams, 36 bags of
   marijuana weighing 2,433 grams, 8 bags of methamphetamines weighing
   219 grams, 4 bags of ecstasy pills weighing 69 grams, 161 lighters, 109
   packs of buglar rolling paper, 74 packs of rolling papers, 32 packs of
   Newport cigarettes tobacco, 31 packs of buglar cigarettes tobacco, 15
   cellphone chargers, 24 cellphones, 4 bottles of promethazine syrup, 2 pair of

Nike Socks, 3 pair of shorts, 1 true religion belt, 1 yellow sin armor outfit, 1 black sweat suit, 1 pair of earbuds, 29 weapons and 1 scale were found at the prison. This incident was not forwarded for investigation.

f.  On May 26, 2023, 10 weapons, 111 grams of tobacco, 04 chargers, 02 lighters, 01 blunt spray, 01 drill bit, 01 safety bit set and 01 Verizon ellipsis jet pack were found at the prison. This incident was not forwarded for investigation

g.  On June 1, 2023, contraband was found on the roof as well as in the dorms but the incident was not forwarded for investigation.

h.  On June 11, 2023, a drone drop occurred where 961 grams of marijuana, 157 grams of meth, 121 grams of ecstasy, and 5802 grams of tobacco as well as other contraband was found. This also included a dermal cutting disc.

i.  On June 25, 2023, 484 grams of marijuana and 605 grams of tobacco as well as other contraband was found after a drone drop. This incident was not forwarded for investigation.

114.

Poor maintenance and pervasive contraband, caused by the supervision, custom, and practices of Defendant Toby, contributed to the violence at Hancock State Prison, including the violence that Mr. Phillips was a victim of during the attack.

115.

At Hancock State Prison, weapons came off of lockers, off of walls, and off of beds.

116.

Poor supervision, prison maintenance, and security practices, caused by the supervision and actions of Defendant Toby contributed to a large amount of contraband, including weapons and drugs, and unsafe facilities.

117.

Unmaintained parts of Hancock State Prison, caused by the supervision of Defendant Toby, jeopardized inmate safety and provided the makeshift weapons for the attack onto Mr. Phillips.

118.

Due to poor maintenance leadership by Defendant Toby, Hancock State Prison itself was a source of dangerous weapons, exposed people to violence, and provided makeshift weapons for the attack onto Mr. Phillips.

119.

Defendant Toby did not take appropriate measures to prevent the movement of contraband, including shanks and drugs, into and around the prison.

120.

Corrupt staff were also a significant source of contraband at Hancock State Prison.

121.

Multiple staff members have been arrested for trafficking contraband into Hancock State Prison.

122.

Defendant Toby was aware of the dangers caused by the facility's poor condition, including providing materials for weapons.

123.

Poor security practices by Defendant Toby contributed to the large amounts of contraband, including shanks and drugs, that moved into and about Hancock State Prison.

124.

Hancock State Prison staff, due to the supervision, customs, and practices of Defendant Toby, did not conduct adequate security rounds to identify and remove contraband.

125.

Planned housing searches were not conducted with necessary frequency, and searches of incarcerated people, including pat searches, were not conducted appropriately.

**<u>Facts Related to the Unconstitutional Supervision and Customs Creating
Widespread Violence Throughout the Georgia Prison System, Including
Hancock State Prison - Count VII (Defendant Holt) & Count VIII (Defendant
Clark)</u>**

<u>Georgia Prison Background and DOJ Investigation:</u>

126.

The Georgia Department of Corrections (hereinafter referred to as "GDC")
incarcerates almost 50,000 people in 34 state-operated prisons and 4 private
prisons, ranging in capacity from fewer than 500 to more than 2,500 beds.

127.

More than 32,000 of GDC's population are classified as medium security
and more than 11,600 are classified as close security. Hancock State Prison is a
close security prison.

128.

The violence and dysfunction that plagues Georgia Prisons has met the
threshold to draw attention from the federal government.

129.

In 2021, the DOJ expanded a prior investigation to include protection of all
incarcerated persons at the medium-and close-security-level prisons, which
includes Hancock State Prison, from violence by other incarcerated persons.

130.

The investigation was conducted jointly by the Special Litigation Section of the Civil Rights Division of the United States Department of Justice and the United States Attorney's Offices for the Northern, Middle, and Southern Districts of Georgia.

131.

As part of the investigation, between 2022 and 2023, DOJ visited 17 Georgia prisons, – about half of the state prisons – representing geographically and demographically diverse areas throughout the state and correctional populations that are the focus of this investigation. This included Hancock State Prison.

132.

The DOJ conducted hundreds of private, one-on-one interviews with incarcerated persons and many more brief conversations while touring the facilities; conducted several dozen interviews with GDC facility staff, investigators, and executive leadership; conducted additional interviews with local coroners, first responders, prosecutors, and employees from other Georgia state agencies; and reviewed tens of thousands of records from GDC, other Georgia state agencies, and third-party entities such as local coroners, EMS providers, and community stakeholders.

133.

The DOJ also reviewed thousands of additional records, including documents from third parties and stakeholders, court records from third-party cases, historical sources, and public reports.

134.

The DOJ worked with four highly qualified expert consultants in conducting this investigation.

a. One was a former high-level state corrections official with decades of experience working in and running state prisons.

b. One was a former law enforcement official who served in a leadership role in a large county jail system, with expertise in data analysis, policy implementation, and staffing assessments.

135.

As have Plaintiffs, even the DOJ has been through significant difficulties in obtaining documents from the GDC regarding the relevant conditions and acts of violence, including Mr. Phillips's homicide, at Georgia prisons, which includes Hancock State Prison :

a. Shortly after launching the expanded investigation in September 2021, DOJ issued a first request for documents to GDC.

b. The GDC refused to produce most of the requested materials until mid-2023, after DOJ issued an administrative subpoena and sought and obtained court enforcement of the subpoena.

c. The GDC also severely limited DOJ's access to its prison facilities and to staff interviews until the district court entered a protective order for the documents DOJ had subpoenaed.

d. Prior to the court's entry of the protective order, the GDC restricted DOJ's access to areas of the prisons accessible to incarcerated persons and facilitated interviews with incarcerated persons but not with staff.

e. Even after GDC began to produce the requested records, the DOJ encountered challenges in gathering documents.

f. The GDC ultimately produced records sufficient for DOJ to make findings, but the agency delayed or objected to production of some of the material, including investigation records.

136.

On October 1, 2024, the DOJ released its findings for its Investigation of Georgia Prisons (hereinafter referred to as "Report").

137.

In the Report, the DOJ found that the Georgia prison system fails to protect incarcerated people from violence and harm by other incarcerated people in violation of the Eighth Amendment.

138.

According to the DOJ in the Report, "The State is deliberately indifferent to these unsafe conditions", and "The State has known about the unsafe conditions for years and has failed to take reasonable measures to address them."

139.

The constitutional violations are exacerbated by serious deficiencies in maintenance by Defendant Clark and deficient classification and housing caused by Defendant Holt.

140.

According to the DOJ in the Report, "The State of Georgia Fails to Reasonably Protect Incarcerated Persons from Violence".

141.

According to the DOJ in the Report, "GDC allows frequent, pervasive violence in the prisons, resulting in serious bodily harm and, in some cases, death".

142.

According to the DOJ in the Report, "The State continues to run its prisons as it has for years, without taking reasonable measures to change course and improve conditions".

143.

According to the DOJ in the Report, "GDC's ineffective classification and housing systems expose incarcerated persons to an unreasonable risk of violence".

144.

According to the DOJ in the Report, "The State is Deliberately Indifferent to the Risk of Harm to Incarcerated Persons".

145.

According to the DOJ in the Report, "GDC prisons are unsafe due to aging and inadequately maintained facilities and failure to ensure adequate lock, tool, and key controls."

146.

According to the DOJ in the Report, "GDC fails to control weapons, drugs, and other dangerous contraband in its prisons".

147.

According to the DOJ in the Report, "After an extensive investigation in Georgia's prisons housing people at the medium- and close-security levels, the Department of Justice (the Department or DOJ) concludes that there is reasonable

cause to believe that the State of Georgia and the Georgia Department of

Corrections (GDC) violate the Eighth Amendment of the United States

Constitution".

148.

According to the DOJ in the report, "GDC fails to provide incarcerated

persons housed at the medium-and close-security levels with the constitutionally

required minimum of reasonable physical safety."

Uncontrolled Violence at Georgia Prisons, including Hancock State Prison:

149.

Over the six-year period from 2018 through 2023, the GDC reported a total

of 142 homicides in its prisons, which includes Hancock State Prison, with 48 in

the first three years and a 95.8% increase in the latter three years, with 94

homicides.

150.

According to GDC mortality reports, in 2018, there were 7 homicides

systemwide; in 2019, that number jumped to 13 homicides.

151.

Since then, there have been well over 20 homicides in Georgia prisons every

year, with 28 in 2020, 28 in 2021, 31 in 2022, and 35 in 2023, according to GDC

data.

152.

The rate of homicides in Georgia prisons, which includes Hancock State

Prison, significantly exceeds the most recent available national data on homicide

rates in correctional facilities.

153.

The national average homicide rate in state prisons across the country for

2019 was 12 per 100,000 people.

154.

Georgia's rate in 2019 was almost triple, at 34 per 100,000 people, and the

numbers of homicides have increased precipitously since then.

155.

Georgia prisons saw an unprecedented 38 homicides in 2023, topping the

previous record of 31 the year before.

156.

Examples of homicides at Georgia facilities, which includes Phillips State

Prison, include, but are not limited to:

a)    Eddie Gosier, 39; May 2, 2020, ligature strangulation. He died just hours

after an inmate with a particularly violent history was moved by guards into his

cell. Gosier's killer, Daniel Luke Ferguson, had previously strangled to death an

inmate at Hays State Prison after being sentenced to life in prison when he was 18 for the shooting death of a neighbor in Walton County.

b)      Terry Lee Bennett II, 43; Jan. 10, 2021, blunt impact to the head

c)      Ali Lamont Tanner, 45; July 2, 2021, stabbed

d)      William Taylor Bodge, 61; Feb. 5, 2022, delayed complications of blunt force injuries

e)      Raphael Zachery Milligan, 41; July 21, 2022, blunt force injuries and strangulation

f)      Joshua Emanuel Williams, 22; July 3, 2020, multiple sharp-force injuries

g)      Jose Martin Ibarra Garcia, 41; June 15, 2021, multiple stab wounds to the head

h)      Edward Jamar McCloud, 40; July 23, 2021, sharp-force injury to the neck

i)      Jamari McClinton, 21; Aug. 11, 2021, stabbed. He was slain just five days after being transferred from Phillips State Prison, where he had been in protective custody after threats from gang members. Protection was removed when he was transferred.

j)      Bedarius Clark, 26; Aug. 21, 2021, homicide, certificate not in. He was found unresponsive in the prison's segregation unit. The GDC described the death as an assault

k)      Kion E. Parks, 31; Sept. 14, 2021, stabbed. Incident report shows five other

inmates were involved in the incident.

l)      Rufus Ramon Lee, 27; Dec. 14, 2021, stab wound of the chest. Incident

report shows four other inmates were involved in the incident.

m)      Kendall Ja'Mal Cromer, 31; Nov. 30, 2020, stab wound of the neck and

chest. Incident report shows four other inmates were involved.

n)      Hendricks Riley Gunn, 42; Jan. 1, 2022, blunt force injuries of head and

neck

o)      Douglas Anthony Forts, 57; June 2, 2022, acute traumatic amputation of

finger during fight

p)      Hezekiah Sha'Nard Cuyler, 21; Sept. 14, 2022, stabbing

q)      Dimitri Merci Jackson, 36; Jan. 3, 2023, stab wound of the chest

r)      Daniel Charriez, 46; Feb. 23, 2022, delayed complications of traumatic brain

injury, four months interval

s)      Boyd Henry Williams, 64; Oct. 3, 2022, manual strangulation, blunt force

trauma to head

t)      Raul Bailon Garcia, 39; April 21, 2020, positional asphyxia and suffocation

due to assault, blunt trauma to soft tissues

u)      Joctavious Artez Newsome, 25; Nov. 4, 2020, stab wound

v)      Demetrius Stubbins, 38; Dec. 21, 2020, stab wound to the chest

w)      Christopher Dewayne Mathis, 37; Feb. 26, 2021, blunt force trauma to head

x)      Fabian Garcia-Mata, 27; Sept. 10, 2021, multiple stab wounds

y)      Troy Donald Harvey, 34; Sept. 12, 2021, stab wound of the chest

z)      Cesar Arnold Pastrana Morales, 33; March 13, 2020, stab wound of the

chest. Incident report shows five other inmates involved in the incident.

aa)     Rashad Bolton, 29; Jan. 4, 2021, puncture wound to the chest with sharp

object

bb)     Dwayne Zackery Jr., 22; Feb. 12, 2021, stab wound to the chest with

homemade knife

cc)     Charles Tristen James McKee, 24; May 23, 2022, stabbed. Incident report

shows five other inmates directly involved. A lawsuit alleges he was placed in a

dorm with known gang members who were hostile to LGBTQ inmates.

dd)     Terry Lee Bishop, 49; Oct. 18, 2022, blunt force trauma, acute toxicity of

methamphetamine, acute toxicity of cannabinoids

ee)     Anthony L. McGhee Jr., 34; March 29, 2020, complications of blunt-force

head trauma and sharp-force trauma of torso and extremities

ff)     Jorge Renberto Ventura-Cabrera, 35; June 5, 2021, stab wounds of neck,

torso and upper extremities. Incident report shows two other inmates involved.

gg)     Quintez Smith, 25; Aug. 29, 2022, multiple sharp-force injuries

hh)    Jerry Lee Brown, 61; Nov. 12, 2020, stab wounds to the head, blunt-force

injury to face

ii)    David Lamar Henegar, 44; Oct. 16, 2021, manual strangulation and blunt-

force injuries of the head, torso and extremities

jj)    Angela Anderson, 39; Sept. 11, 2022, asphyxia due to neck and chest

compression

kk)    Johnny Eugene Young, 24; Jan. 27, 2020, sharp-force injury of

mouth/tongue

ll)    Rafael Blas Becerra, 36; March 7, 2020, stab wounds to the upper torso.

Incident report shows seven other inmates involved, with six injured.

mm)  Carrington Juwon Frye, 23; March 20, 2020, stab wounds of the neck and

chest. Incident report shows two other inmates involved.

nn)    David Travis Alexander Dennis, 35; May 13, 2020, multiple sharp-force

injuries

oo)    Coty Dustin Silvers, 39; May 23, 2020, asphyxia

pp)    Bobby Edward Lee Jr., 38; July 13, 2020, ligature strangulation. A federal

lawsuit alleges he died from gang violence, understaffing, and indifference by

prison officials.

qq)    Robbie B. Brower, 58; Oct. 4, 2020, blunt and sharp-force injuries to the

head and neck

rr)    Raul Villegas, 37; Dec. 13, 2020, stab wound to the torso. Incident report

shows three other inmates involved.

ss)    Carlos Maurice Fisher Jr., 30; May 10, 2021, multiple sharp-force injuries

tt)    Ryan Weston Darville, 37; Dec. 29, 2021, stab wounds of the chest

uu)    Joseph Walter Brown, 36; July 26, 2022, multiple stab wounds

vv)    Dan Brooks, 50; Aug. 21, 2022, stab wound of the neck

ww)    Kendrick Malik Brown, 25; Oct. 16, 2022, blunt-force head injury

xx)    James Cornelius McLeroy III, 26; Dec. 19, 2022, stab wounds of the torso

yy)    Norman Samples, 59; Dec. 27, 2022, blunt force injuries of the head and

torso

zz)    Dave Stone, 61; Nov. 20, 2021, closed head trauma, delayed effects

aaa)    Jamal Cymonne Johnson, 32; June 11, 2022, stab wounds of the head

bbb)    Sidney Sanchez Nealey, 22; July 18, 2022, stab wounds of the torso

ccc)    Jacob Kendall Daniels, 18; Aug. 13, 2022, stab wound of the neck, shoulder

and arm

ddd)    Quafabian Melik McBride, 19; Sept. 30, 2022, stab wound of chest, injuring

heart; sharp-force injuries of head, torso and upper extremities. Stabbing occurred

during a gang-related fight in the lockdown unit. McBride was housed elsewhere in

the prison and had been brought to lockdown that day through the arrangements of

officers.

eee)    Alim Rasheed Lovett, 33; Dec. 8, 2022, stab wounds of the back, injuring

right lung. Also sharp-force injuries of the head, torso and right thigh. Incident

report shows four other offenders involved.

fff)    Curtis Mincey, 74; July 22, 2021, blunt-force trauma of the head, neck, torso

and extremities

ggg)    Taylor Harrison Brooks, 26; April 10, 2020, multiple stab wounds

hhh)    John Bretleir Reyes Cardona, 24; April 20, 2020, exsanguination (severe

loss of blood) from stab wound to neck

iii)    Justin Nathaniel Wilkerson, 25; Jan. 5, 2021, asphyxia, neck compression

jjj)    Desmond Hill, 35; April 9, 2021, strangulation

kkk)    Hiwatha Abdulcah Hakeem Jr., 26; April 12, 2021, multiple stab wounds.

Incident report shows four other offenders involved.

lll)    Derrick Dionte Deshun Harvey, 26; June 25, 2021, stab wound to the chest

mmm)        Christopher Ray Reynolds, 38; July 1, 2021, blunt- and sharp-force

injuries of the head and neck

nnn)    Christopher Michael Redwine, 45; Sept. 27, 2021, asphyxia due to manual

strangulation

ooo)    Nathan Michael Mahan, 37; Oct. 23, 2022, stab wounds

ppp)    Randy O'Neal Wynn, 54; March 1, 2023, homicide. Lawsuit alleges a

failure to protect, deficient classifications by Defendant Holt, and failure to

maintain facilities by Defendant Clark. In this case, the inmate was killed by his cellmate and was undiscovered through the night.

qqq)  Cedric La'Troy Johnson Sr., 35; March 13, 2020, strangulation

rrr)  Aldrich Norval Cain, 26; April 23, 2020, multiple stab wounds. Incident report shows four other inmates involved.

sss)  Marcus Derrelle Pearson Jr., 28; May 29, 2020, multiple stab wounds. Incident report shows two other inmates involved.

ttt)  Luis Garcia Palacio, 41; July 28, 2020, blunt impact injuries of the head

uuu)  Juan Carlos Arguelles-Reveles, 37; May 7, 2021, stabbing. Incident report shows 11 other inmates involved.

vvv)  Xavier LaMar Warren, 32; Dec. 28, 2022, stab wound of the torso. Incident report shows four other inmates involved.

www)  Logan Todd Peterson, 27; Dec. 27, 2021, post-traumatic subarachnoid hemorrhage (bleeding in the space around the brain), assault

xxx)  Prince Leonard Blige, 54; Feb. 12, 2020, stab wound to torso

yyy)  Orvonta Tillman, 36; June 16, 2020, multiple sharp-force penetrating trauma to thorax

zzz)  Bobby Carpenter, 31; Sept. 9, 2020, stab wound to the chest

aaaa)  Hakeem Olajuwon Williams, 27; Feb. 28, 2022, stab wound to the chest

bbbb)  Dexter Jarrod Burnett, 35; Sept. 16, 2022, stab wound of the torso

cccc)  Robert Lee Wilson III, 31; July 17, 2020, multiple stab wounds. Incident report shows 16 other inmates involved, seven of whom were injured.

dddd) Christopher Arnett Rawls, 32; Sept. 5, 2020, strangulation

eeee)  Christopher Eli Gresham, 39; Sept. 30, 2021, stab wounds of back and lower extremities. A Sept. 30, 2021, incident report of a homicide says three other inmates were involved.

ffff)   Kyle Anthony Strother, 31; June 5, 2022, stab wound of the chest

gggg) Va'Darian LaVianta Carr, 26; Sept. 18, 2022, stab wound of the chest and back

hhhh) Marquis Reshawn Jefferson, 26; May 12, 2022, stab wounds of torso and arm. A May 11, 2022, incident report of a homicide says four other inmates were involved.

iiii)    DaQuavious Cachone Lackey, 21; May 16, 2022, stab wound of the neck and multiple blunt-force injuries

jjjj)    Michael Lee Jackson, 60; Aug. 17, 2022, multiple blunt-force injuries in the setting of hypertensive cardiovascular disease. Incident report shows two other inmates were involved.

kkkk) James Forest Williams, 43; Oct. 3, 2022, blunt and sharp force injuries of head, torso and extremities.

llll) Arthur Wimbush, Lawsuit alleged failure to protect as well as deficient classifications by Defendant Holt.

157.

In addition to deaths due to violence in the prisons, including Hancock State Prison, other serious and life-threatening incidents are exponentially more frequent.

158.

Based on GDC's records, the levels of reported incidents of violence within the GDC system are consistently high.

159.

From January 2022 through April 2023, there were more than 1,400 reported incidents of violence, including fights, assaults, hostage incidents, and homicides, across the close-security prisons and most of the medium-security prisons, which includes Phillips State Prison. Of these incidents 19.7% involved a weapon, 45.1% resulted in serious injury, and 30.5% resulted in offsite medical treatment.

160.

From January 2022 through April 2023, the overall incidence of violence gradually increased across the close-security prisons and most of the medium-security prisons, which includes Hancock State Prison.

161.

The numbers do not capture the full scope of violence within the system because:

a. First, violent incidents are consistently underreported due to a lack of staff supervision and other factors, causing some incidents never to be reported at all; and

b. Second, violent incidents are often mischaracterized using inappropriate incident-type categories, resulting in under-counting of violent incidents such as assaults and fights.

162.

The DOJ's investigation identified hundreds of serious incidents that highlight the systemic violence and chaos in Georgia prisons, and Georgia's failure to control it.

163.

In interviews at 16 of the 17 Georgia prisons the DOJ visited in 2022 and 2023, which includes Hancock State Prison, incarcerated people consistently reported that they have witnessed life-threatening violence, including stabbings, and that weapons are widespread in the prisons.

164.

In October 2020, at Georgia State Prison, an incarcerated man was taken to the hospital by ambulance for a cut to his forehead and dark ligature marks around his neck. (Hereinafter referred to as "2020 GA SP Incident").

165.

In the 2020 GA SP Incident, the incarcerated man reported that his bunkmate had tried to kill him by wrapping a sheet around his neck. Less than five months later, an ambulance returned to GSP to pick up the same man. This time, he had yellow and purple bruising on the entire right side of his face, a deformity indicating a possible jaw fracture and multiple human bite marks all over his body.

166.

In the 2020 GA SP Incident the man was so malnourished that every bone in his spine was bruised. He reported that he had been kicked in the face, people had been stealing his food for months, his bunkmate had been sexually assaulting and raping him, and nobody was helping him.

167.

On August 3, 2020, an officer at Phillips State Prison was conducting rounds in a housing unit when an incarcerated person handed him a note stating that an incarcerated person in another cell had been held hostage for days, was yelling for help, and might be injured. In May 2023, DOJ interviewed the victim, who reported that he had been held and tortured for almost four days, he had been

stabbed from behind and his eye was pierced and he suffered a traumatic brain injury.

168.

Almost exactly a year later from the incident in the above allegation, on August 12, 2021, the same assailant assaulted another incarcerated person at the same prison; the victim of the second assault required outside medical treatment at a hospital.

169.

At Smith State Prison, in May 2020, GDC staff informed emergency services responders that an incarcerated person had been tied up, beaten, and waterboarded by his cellmate. (hereinafter referred to as "2020 Smith Incident")

170.

In the 2020 Smith Incident, the cellmate also inserted multiple bars of soap into the victim's rectum. One bar of soap, covered in stool and blood, had already fallen out. The victim suffered multiple contusions to his face and chest and was bleeding heavily from his nose and mouth. He had ligature marks on his neck and still had makeshift binding around his wrist. He was transported to a local hospital; while he was being moved to an emergency-room bed, two more bars of soap fell out of his rectum. The hospital found that most of his upper teeth had been broken

during the assault. One hundred-fifty milliliters of blood was suctioned from his airway.

171.

Within a span of just four days in one case in 2023, two brutal assaults occurred in the same facility, one of which resulted in a man's death. They include:

a. An incarcerated man was discovered dead, possibly strangled to death by his roommate in a segregated housing unit. The local coroner noted the body was badly decomposed, and the man likely had been dead for over two days; and

b. Four days prior, another person was assaulted by multiple incarcerated people inside another housing unit. A video of the assault was uploaded onto social media, where the victim's family saw it several days later. The video showed an incarcerated man sitting on the floor with his hands tied behind his back before a group of men around him punched, kicked, and stabbed him

172.

District Attorneys from around the state told DOJ that the proportion of violent crimes originating in the prisons, including homicides, has increased in recent years, straining prosecutorial resources.

173.

Killings, stabbings, and assaults are common at Georgia Prisons, which includes Hancock State Prison. Plaintiff was a victim of assault and stabbing at Hancock State Prison.

Deficient Classification Count VII (Defendant Holt)-

174.

At all relevant times herein, Defendant Holt was responsible for Inmate Classification policies, procedures, and practices.

175.

At all relevant times, Defendant Holt was responsible for monitoring the overall supervision and safety of nearly 52,000 felony offenders.

176.

Mr. Phillips was at constant risk of danger, serious personal injury, and death due to Defendant Holt's failure to use correctional practices such as classification and assessment of the likelihood of victimization to reduce the risk of violence. Such failures led to Mr. Phillips's death.

177.

Georgia prisons, as a result of Defendant Holt's actions, have ineffective classification and housing systems that expose incarcerated persons to an unreasonable risk of violence.

178.

Georgia prisons, as a result of Defendant Holt's actions, have classification and housing systems that do not function properly. Georgia prisons do not conduct timely and accurate classification and segregation reviews due to staffing shortages and the incomplete data in GDC's automated systems.

179.

Georgia prisons have a computerized classification system, the "Next Generation Assessment" (NGA) tool.

180.

GDC officials explained that the NGA tool was developed for GDC, and that it uses data entered into GDC's correctional management database to calculate a security-level score for each incarcerated person.

181.

Thus, individuals' security scores should be updated based on new STG information, incident reports, disciplinary reports, and other inputs as they are entered into the system.

182.

A computerized system like this can be an effective tool, but it must be combined with individual classification and re-classification reviews by staff, and the system must receive relevant updated information such as serious incident occurrences.

183.

Defendant Holt fails to ensure that classification reviews are conducted by qualified staff.

184.

The DOJ found that staff do not consistently implement the agency's own classification timelines and procedures, such as those that mandate classification and segregation reviews and counselor meetings.

185.

Internal audits from several Georgia prisons in 2023 found delayed initial counseling sessions, inconsistent or inadequate scheduling and completion of counseling sessions, and incomplete classification documentation.

186.

In a review of data from 16 Georgia prisons from January 2022 to August 2023, the DOJ found that most of the prisons reviewed failed to fully staff allotted counselor positions, and several had counselor staffing rates in the 50% range or lower.

187.

Without adequate counselor staffing, Georgia prisons cannot ensure that incarcerated persons are classified and reclassified properly and that their housing

assignments are reasonably safe and appropriate for their security level and other housing needs.

188.

Even if Georgia prisons had the staff to effectuate classification and reclassification, the GDC's computerized system is only as good as the data upon which it relies. The NGA tool relies on information from the State's incident reporting and records databases, which have significant data reliability issues. The State's staffing problems and operational issues with incident reporting and follow-up mean that serious incidents often are unreported, misreported, or inadequately investigated.

189.

In May 2022, a 21-year-old man was killed by his cellmate at Calhoun State Prison following multiple failures in GDC's classification and housing systems.

190.

The homicide occurred after staff moved the assailant out of segregation, to general population, and then back to segregation without following classification and housing assignment procedures.

191.

When staff moved the individual back to segregation, he requested to be placed in a particular cell, and staff housed him there with a cellmate.

192.

The next day, the two cellmates told an orderly that they wanted to be separated, which the orderly communicated to an officer.

193.

One day later, an orderly saw the individual being beaten by his cellmate. The man died. The autopsy revealed blunt force trauma injuries and a stab wound to the neck.

194.

The GDC closed its criminal investigation without a thorough administrative review into a breakdown of its classification process.

195.

An administrative review should have addressed the staff errors, as well as errors in housing records, and indications of personal connections between a staff member and gangs

196.

There was no evidence of discipline or counseling in the personnel files of three employees whose errors were identified in the investigation as relevant to the man's death.

Failure to ensure maintenance- Count VIII (Defendant Clark)-

197.

Contraband weapons, illicit drugs, and cellphones are commonplace across Georgia's prisons, which includes Hancock State Prison

198.

Georgia prisons are unsafe due to aging and inadequately maintained facilities. Defendant Clark through his supervision, failed to maintain Georgia prisons, including Hancock State Prison.

199.

Adequate preventive maintenance are essential components of prison security.

200.

Damage to facility hardware and infrastructure poses risks to incarcerated persons' physical safety, as furniture and fixtures can be dismantled to make weapons, holes in ceilings and walls can be used to gain access to unauthorized areas or to hide contraband, and dilapidated and unsanitary conditions can lead to internal tension.

201.

Defendant Clark failed to maintain Georgia prisons, including Hancock State Prison, in reasonably safe and secure conditions, placing incarcerated people and others inside and outside the facilities at unacceptable risk.

202.

GDC's internal facility audits, as well as information DOJ obtained from facility site inspections and interviews with staff and incarcerated people, establish that GDC does not take the steps necessary to maintain secure prisons, including timely preventive and corrective maintenance.

203.

Leadership has acknowledged that aging facilities raise challenges across the system, with the average GDC prison over 30 years old and reaching "end of life," according to a recent public presentation by the Commissioner.

204.

Poor maintenance and pervasive contraband, caused by the supervision and custom of Defendant Clark, contribute to the violence at Georgia prisons, including the violence that Plaintiff was a victim of during the attack.

205.

Defendant Clark was aware of the danger these conditions pose to incarcerated people but failed to take adequate action to make the facility safe.

206.

Unmaintained parts of Georgia prisons, caused by the supervision and custom of Defendant Clark jeopardize inmate safety and provided the makeshift weapons for the attacks onto Mr. Phillips.

207.

Due to poor maintenance by Defendant Clark, Georgia prisons are a source of dangerous weapons and expose people to violence.

208.

Frequently, Georgia prisons, through the leadership of Defendant Clark, fail to promptly fix things that break in its facilities – even when the thing that is broken is as central to prison operations as a lock or key.

209.

The DOJ was told repeatedly by incarcerated people, including those who work maintenance details and are responsible for facility repairs, and some staff that an enormous amount of repair work was undertaken prior to DOJ's site visits to each prison. Despite these efforts, during site visits, the DOJ's experts observed physical building and maintenance issues that affect security, including broken or exposed electrical outlets and wiring, metal fixtures, large holes or patched areas in ceilings and walls, and small holes and cracks in walls and windows.

210.

Georgia prisons, under the leadership of Defendant Clark, also fail to comply with their own policies to regularly evaluate, test, and document the condition of its security infrastructure and systems.

211.

Internal audits confirm that Georgia prisons fail to take necessary steps to ensure its prisons are secure.

212.

For example, several 2023 facility audits found that Georgia prisons fail to perform required checks of windows and doors to ensure they have not been cut or modified.

213.

Several facility audits also found that Georgia prisons fail to maintain accurate key and tool inventories and to document key counts and checks.

214.

For example, one 2023 facility audit of a close-security men's prison noted inconsistencies in accounting for and inventorying tools, and a lack of consistent control and documentation regarding chemical agents, weapons, and inventory.

215.

Defendant Clark's failure to maintain control of such sensitive equipment as keys and tools exposes the population (and staff) to an unreasonable risk of harm, because discrepancies and failures to follow policies in these areas can compromise the physical security of the facilities' doors and gates and can facilitate the use of weapons and other contraband.

216.

Between November 2021 and August 2023, Georgia prisons recovered 27,425 weapons, 12,483 cellphones, and 2,016 illegal drug items.

217.

GDC officials acknowledged that the agency's problems with contraband are extensive in scope and that the prevalence of contraband places the population at risk.

Knowledge of Violence Count VII (Defendant Holt) and Count VIII (Defendant Clark)-

218.

Year after year, the prisons continue to collect enormous amounts of contraband, including weapons, drugs, and electronics, from within prisons across the system. Defendant Clark is aware of this.

219.

GDC officials also have acknowledged its facilities are in dire need of repair.

220.

The State of Georgia has closed some facilities and undertaken renovations in others.

221.

For example, in early 2022, GDC closed Georgia State Prison, a notoriously violent and dilapidated prison.

222.

In 2023, GDC announced plans to close or repurpose Lee Arrendale State Prison.

223.

Through their own data and public attention, Defendant Holt and Defendant Clark have been aware that systemic deficiencies within the Georgia prison system increase the risk of harm to the people in its custody.

224.

Defendant Clark's and Defendant Holt's efforts have been inadequate, as evidenced by the ongoing harm and significant risk of serious harm in the prisons.

225.

It is plainly evident, from not only the crime in the prisons but also by the prevalence of harm, that Georgia prisons expose the people it incarcerates to a substantial risk of serious harm, and that Defendant Holt's and Defendant Clark's, practices have failed to address the pervasive problems.

226.

Several recent lawsuits against officials at Georgia prisons have alleged constitutional violations, including failure to protect incarcerated people from harm.

227.

Reportedly, the GDC has spent almost $20 million since 2018 to settle claims involving death or injury to people incarcerated in its prisons.

228.

In 2023, the GDC settled a lawsuit brought by an incarcerated man's family, after he was strangled to death by his cellmate at Macon State Prison in 2020, a consequence, the family alleged, of GDC's deliberate indifference.

229.

In a state-court lawsuit against GDC, GDC's former medical contractor alleged in its pleadings that GDC's failure to control violence in the prisons led to extraordinarily high medical costs for trauma care.

230.

Defendant Clark and Defendant Holt are aware of the facts in the above allegations.

231.

Moreover, Defendant Clark and Defendant Holt are aware, through GDC data, that violence and threats of violence are widespread in the prisons.

232.

GDC leadership officials, such as Defendant Clark and Defendant Holt, are sent a selected portion of the data that facilities collect in incident reports and other documentation.

233.

For each facility, a monthly report containing statistics, including those related to violent incidents, is generated for review by the warden and regional manager. Defendant Clark and Defendant Holt read over these reports.

234.

Defendant Clark and Defendant Holt receive reports of emergencies and serious incidents across the system.

235.

For example, from 2022 through April 2023, these reports available to GDC leadership, such as Defendant Clark and Defendant Holt, included 1,045 incidents of violence, including assaults, fights, and homicides.

236.

Georgia prisons also produce comprehensive reports of statistics monthly, including the number of assaults, deaths, and uses of force. Defendant Clark and Defendant Holt read these reports.

237.

Defendant Clark and Defendant Holt are likewise aware of factors that increase the risk of violence in GDC facilities.

238.

Defendant Clark and Defendant Holt likewise have been on notice of systemic deficiencies that contribute to harm in its prisons.

239.

Defendant Clark and Defendant Holt have known of the substantial risk of serious harm presented by widespread violence in Georgia prisons, but rather than address the violence, they have failed to take reasonable steps to address those unconstitutional conditions.

240.

The constitutional deprivations caused by Defendant Clark and Defendant Holt led directly to the attack, injury, deficient medical care, and death of Mr. Phillips.

## COUNT I
### Section 1983 Claim under Eighth Amendment: Cruel and Unusual Punishment; Deliberate Indifference to Known Substantial Risk of Serious Harm; Failure to Protect; Failure to Take Reasonable Measures to Guarantee Safety (Against Defendant Ivey, Individually)

241.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-101 of the instant Complaint as if fully set forth herein verbatim.

242.

There was a substantial risk of serious harm to Mr. Phillips as there was an excessive risk of inmate-on-inmate violence at Hancock State Prison where

violence and terror reign. Inmate-on-inmate violence was the norm or something close to it as evidenced by the numerous stabbings and homicides at Hancock State Prison.

243.

There was a substantial risk of serious harm to Mr. Phillips leading up to his homicide, as he suffered from a long history of segregated housing, involuntary medication, severe mental illness/disability, and prior victimization. Further, Inmate Garrison suffered from a long history of mental illness, was in prison for aggravated assault with a deadly weapon, was high on methamphetamine, and previously and recently stabbed another inmate necessitating segregated housing.

244.

Defendant Ivey actually knew of the risks of serious harm because he was told by both Mr. Phillips and Inmate Garrison that they were not supposed to be housed together, witnessed Mr. Phillips's door blockaded by toothbrushes, knew that Inmate Garrison was carrying a makeshift weapon on the day of transfer, was aware of Mr. Phillips's extensive mental health history, segregated housing, and involuntary medication, and was aware of Inmate Garrison's past criminal history as well as prior stabbing of another inmate.

245.

Defendant Ivey, individually, was deliberately indifferent to and disregarded the substantial risks of serious harm posed to Mr. Phillips leading up to his homicides, failed to keep Mr. Phillips reasonably safe by ordering the placement of these two segregated inmates without regard for the consequences and risks of his actions. He justified placing Inmate Garrison in Mr. Phillips's cell as opposed to another cell because Inmate Garrison joined in a grievance with Mr. Phillips.

246.

Defendant Ivey knowingly failed to take reasonable steps to protect Mr. Phillips from violence at the hands of Inmate Garrison who posed a substantial risk of serious harm to Mr. Phillips by ordering the placement of these two segregated inmates without regard for the consequences and risks of his actions. He justified placing Inmate Garrison in Mr. Phillips's cell as opposed to another cell because Inmate Garrison joined in a grievance with Mr. Phillips.

247.

Mr. Phillips was attacked, stabbed, and killed by Inmate Garrison as a result of Defendant Ivey's deliberate indifference described herein.

248.

As indicated above, Defendant Ivey's conduct displayed subjective recklessness.

249.

There is an affirmative causal connection between Defendant Ivey's conduct and the constitutional deprivations described herein. Defendant Ivey's failure to protect as described herein caused Mr. Phillips's injuries and death, and Mr. Phillips's injuries and death were a foreseeable consequence of Defendant Ivey's failure to protect.

250.

Defendant Ivey's failures to take reasonable action to protect Mr. Phillips from known risks of serious harm amounted to deliberate indifference and a failure to protect in violation of the Eighth Amendment and proximately caused Mr. Phillips physical and mental pain and suffering, extreme mental distress, serious bodily injury, disfigurement, violations of constitutionally protected rights, medical bills, wrongful death, and other general and special damages.

251.

Defendant Ivey is not entitled to qualified immunity because his conduct violated the basic legal principle that "A prison official violates the Eighth Amendment "when a substantial risk of serious harm, *of which the official is subjectively aware,* exists and the official does not respond reasonably to the risk.". *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014).

252.

Defendant Ivey is not entitled to qualified immunity as indicated by cases such as *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014), *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312 (11th Cir. 2016), and others.

253.

As a result of the wrongful conduct described above, Mr. Phillips suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, funeral/end of life expenses, violations of constitutionally protected rights, wrongful death, and other general and special damages.

**COUNT II**
**Section 1983 Claim under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and**
**Unusual Punishment; Personal Participation Supervisory Liability Over**
**Deliberate Indifference to a Serious Risk of Harm and Failure to Protect**
**(Against Defendant Ivey, Individually)**

254.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-101 of the instant Complaint as if fully set forth herein verbatim.

255.

Defendant Ivey is liable to Plaintiffs for his failures to adequately supervise prison staff regarding their duties to keep Mr. Phillips safe from violence at the hands of other prisoners.

256.

Defendant Ivey was subjectively aware of the actions and omissions of his subordinates when he directed officers to place Inmate Garrison into Mr. Phillips's cell despite the known risks of serious harm. This is supported by the fact that Defendant Ivey was directly involved in placing Inmate Garrison in the cell with Mr. Phillips.

257.

Defendant Ivey ratified the actions and omissions of his subordinates when he directed Inmate Garrison to be placed into the segregated housing cell with Mr. Phillips.

258.

Defendant Ivey refused to take action to supervise his staff to protect Mr. Phillips from violence at the hands of other prisoners, which resulted in Mr. Phillips's injury, disfigurement, pain and suffering, constitutional deprivations, medical bills/end of life expenses, wrongful death, and other harms and damages.

259.

Defendant Ivey's refusal to take action to supervise his staff to protect Mr. Phillips from violence at the hands of other Prisoners caused Mr. Phillips's constitutional deprivations, injuries, death, and damages as described herein.

260.

Defendant Ivey's personal participation as described herein caused Plaintiff to be stabbed multiple times by his violent cellmate.

261.

Defendant Ivey is not entitled to qualified immunity for his conduct in failing to supervise prison staff to protect Mr. Phillips from violence at the hands of other prisoners.

262.

As a result of the wrongful conduct described above, Mr. Phillips suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, funeral/end of life expenses, violations of constitutionally protected rights, wrongful death, and other general and special damages.

**COUNT III**
**Section 1983 Claims under First and Eighth Amendment**
**Retaliation for Writing Grievances; Cruel and Unusual Punishment;**
**Retaliatory Placement of Violent Inmate in Cell**
**(Against Defendant Ivey, Individually)**

263.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-101 of the instant Complaint as if fully set forth herein verbatim.

264.

Mr. Phillips attempted to use the legal system and communicated his attempt to use the legal system to Defendant Ivey by writing grievances.

265.

Mr. Phillips's attempts to use the legal system and communications to Defendant Ivey of his intent to use the legal system were made in good faith as an exercise of Mr. Phillips's First Amendment rights and were not bad-faith threats intended as acts of harassment.

266.

Defendant Ivey intentionally retaliated against Mr. Phillips and punished Mr. Phillips because of his attempt to use the legal system and his communications of his intent to use the legal system to Defendant Ivey by placing Inmate Garrison a known violent inmate with housing restrictions into a solitary cell with Mr. Phillips, an inmate with historical mental health issues, involuntary medication, and prior victimizations.

267.

Defendant Ivey acted under color of law when he retaliated against and punished Mr. Phillips.

268.

Such conduct constituted retaliation in violation of the First Amendment as well as cruel and unusual punishment in violation of the Eighth Amendment.

269.

Defendant Ivey is not entitled to qualified immunity for his conduct as described herein.

270.

As a result of the wrongful conduct described above, Mr. Phillips suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, funeral/end of life expenses, violations of constitutionally protected rights, wrongful death, and other general and special damages.


**COUNT IV**
**Section 1983 Claim under Eighth Amendment: Cruel and Unusual Punishment; Deliberate Indifference to Known Substantial Risk of Serious Harm; Failure to Protect; Failure to Take Reasonable Measures to Guarantee Safety (Against Defendant Swint, Individually, or in the alternative Defendant Dixon)**

271.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-101 of the instant Complaint as if fully set forth herein verbatim.

272.

Defendant Swint's and Defendant Dixon's conduct in this Count are pled in the alternative, that is the conduct complained of was either committed by Defendant Swint or Defendant Dixon.

273.

There was a substantial risk of serious harm to Mr. Phillips as there was an excessive risk of inmate-on-inmate violence at Hancock State Prison where violence and terror reign. Inmate-on-inmate violence was the norm or something close to it as evidenced by the numerous stabbings and homicides at Hancock State Prison.

274.

There was a substantial risk of serious harm to Mr. Phillips leading up to his homicide, as he suffered from a long history of segregated housing, involuntary medication, severe mental illness/disability, and prior victimization. Further, Inmate Garrison suffered from a long history of mental illness, was in prison for aggravated assault with a deadly weapon, was high on methamphetamine, and previously and recently stabbed another inmate necessitating segregated housing.

275.

There was a substantial risk of serious harm to Mr. Phillips leading up to his homicide, as Defendant Swint, or in the alternative Defendant Dixon found a makeshift weapon in Inmate Garrison's pocket right before the transfer.

276.

Defendant Swint, or in the alternative Defendant Dixon actually knew of the risks of serious harm because she witnessed Mr. Phillips's door blockaded by toothbrushes, knew that Inmate Garrison was carrying a makeshift weapon on the day of transfer, was aware of Mr. Phillips's extensive mental health history, segregated housing, and involuntary medication, and was aware of Inmate Garrison's past criminal history as well as prior stabbing of another inmate.

277.

Defendant Swint, or in the alternative Defendant Dixon, was deliberately indifferent to and disregarded the substantial risks of serious harm posed to Mr. Phillips leading up to his homicide and failed to keep Mr. Phillips reasonably safe by placing inmate Garrison in the cell with Mr. Phillips and failing to search Inmate Garrison's belongings for other weapons after she found a weapon in his pocket.

278.

Defendant Swint, or in the alternative Defendant Dixon, knowingly failed to take reasonable steps to protect Mr. Phillips from violence at the hands of Inmate

Garrison who posed a substantial risk of serious harm to Mr. Phillips by placing inmate Garrison in the cell with Mr. Phillips and failing to search Inmate Garrison's belongings for other weapons after she found a weapon in his pocket.

279.

Mr. Phillips was attacked, stabbed, and killed by Inmate Garrison as a result of Defendant Swint's, or in the alternative Defendant Dixon's, deliberate indifference described herein.

280.

As indicated above Defendant Swint's, or in the alternative Defendant Dixon's, conduct displayed subjective recklessness.

281.

There is an affirmative causal connection between Defendant Swint's, or in the alternative Defendant Dixon's, conduct and the constitutional deprivations described herein. Defendant Swint's, or in the alternative Defendant Dixon's, failure to protect as described herein caused Mr. Phillips's injuries and death, and Mr. Phillip's injuries and death were a foreseeable consequence of Defendant Swint's, or in the alternative Defendant Dixon's, failure to protect.

282.

Defendant Swint's, or in the alternative Defendant Dixon's, failures to take reasonable action to protect Mr. Phillips from known risks of serious harm

amounted to deliberate indifference and a failure to protect in violation of the Eighth Amendment and proximately caused Mr. Phillips physical and mental pain and suffering, extreme mental distress, serious bodily injury, disfigurement, violations of constitutionally protected rights, medical bills, wrongful death, and other general and special damages.

283.

Defendant Swint, or in the alternative Defendant Dixon, is not entitled to qualified immunity because her conduct violated the basic legal principle that "A prison official violates the Eighth Amendment "when a substantial risk of serious harm, *of which the official is subjectively aware,* exists and the official does not respond reasonably to the risk.". *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014).

284.

Defendant Swint, or in the alternative Defendant Dixon, is not entitled to qualified immunity as indicated by cases such as *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014), *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312 (11th Cir. 2016), and others.

285.

As a result of the wrongful conduct described above, Mr. Phillips suffered from permanent injuries, disfiguring injuries, physical and mental pain and

suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, funeral/end of life expenses, violations of constitutionally protected rights, wrongful death, and other general and special damages.

**COUNT V**
**Section 1983 Claim under Eighth Amendment: Cruel and Unusual Punishment; Deliberate Indifference to Known Substantial Risk of Serious Harm; Failure to Protect; Failure to Take Reasonable Measures to Guarantee Safety (Against Defendant Salad, Individually)**

286.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-101 of the instant Complaint as if fully set forth herein verbatim.

287.

There was a substantial risk of serious harm to Mr. Phillips as there was an excessive risk of inmate-on-inmate violence at Hancock State Prison where violence and terror reign. Inmate-on-inmate violence was the norm or something close to it as evidenced by the numerous stabbings and homicides at Hancock State Prison.

288.

There was a substantial risk of serious harm to Mr. Phillips leading up to his homicide, as he suffered from a long history of segregated housing, involuntary medication, severe mental illness/disability, and prior victimization. Further, Inmate Garrison suffered from a long history of mental illness, was in prison for

aggravated assault with a deadly weapon, was high on methamphetamine, and

previously and recently stabbed another inmate necessitating segregated housing.

Further, both Inmate Garrison and Mr. Phillips had been fighting in that room.

289.

Defendant Salad actually knew of the risks of serious harm because he was

aware of Mr. Phillips's extensive mental health history, segregated housing, and

involuntary medication, and was aware of Inmate Garrison's past criminal history

as well as prior stabbing of another inmate.

290.

Defendant Salad actually knew of the risks of serious harm because Inmate

Garrison and Mr. Phillips fought with each other and called for help from orderlies

and Defendant Salad, Inmate Garrison's and Mr. Phillips's room was in disarray as

if the two had been fighting, Inmate Garrison was high on methamphetamines and

displayed obvious signs of this high to Defendant Salad, such as increased energy

and paranoia, and both Inmate Garrison and Mr. Phillips begged Defendant Salad

to be separated because they feared the other would cause harm or kill them.

291.

Defendant Salad, individually, was deliberately indifferent to and

disregarded the substantial risks of serious harm posed to Mr. Phillips leading up to

his homicide, failed to keep Mr. Phillips reasonably safe by ignoring the pleas,

closing the flap, and walking away without separating Mr. Phillips and Inmate Garrison.

292.

Defendant Salad knowingly failed to take reasonable steps to protect Mr. Phillips from violence at the hands of Inmate Garrison who posed a substantial risk of serious harm to Mr. Phillips by ignoring the pleas, closing the flap, and walking away without separating Mr. Phillips and Inmate Garrison.

293.

Mr. Phillips was attacked, stabbed, and killed by Inmate Garrison as a result of Defendant Salad's deliberate indifference described herein.

294.

As indicated above Defendant Salad's conduct displayed subjective recklessness.

295.

There is an affirmative causal connection between Defendant Salad's conduct and the constitutional deprivations described herein. Defendant Salad's failure to protect as described herein caused Mr. Phillips's injuries and death, and Mr. Phillips's injuries and death were a foreseeable consequence of Defendant Salad's failure to protect.

296.

Defendant Salad's failures to take reasonable action to protect Mr. Phillips from known risks of serious harm amounted to deliberate indifference and a failure to protect in violation of the Eighth Amendment and proximately caused Mr. Phillips physical and mental pain and suffering, extreme mental distress, serious bodily injury, disfigurement, violations of constitutionally protected rights, medical bills, wrongful death, and other general and special damages.

297.

Defendant Salad is not entitled to qualified immunity because his conduct violated the basic legal principle that "A prison official violates the Eighth Amendment "when a substantial risk of serious harm, *of which the official is subjectively aware,* exists and the official does not respond reasonably to the risk.". *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014).

298.

Defendant Salad is not entitled to qualified immunity as indicated by cases such as *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014), *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312 (11th Cir. 2016), and others.

299.

As a result of the wrongful conduct described above, Mr. Phillips suffered from permanent injuries, disfiguring injuries, physical and mental pain and

suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, funeral/end of life expenses, violations of constitutionally protected rights, wrongful death, and other general and special damages.

## COUNT VI
### Section 1983 Claim under Eighth Amendment, Cruel and Unusual Punishment --- Supervisory Claim for Uncontrolled Violence at Hancock State Prison caused by a Failure to Investigate and Correct Incidences of Violence & Failures to Prevent the Free Flow of Makeshift Weapons (Against Defendant Toby, Individually)

300.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-125 of the instant Complaint as if fully set forth herein verbatim.

301.

Defendant Toby was the Warden at Hancock State Prison at all relevant times to this Complaint and was responsible and had the authority for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

302.

Defendant Toby is sued for her failures to maintain security practices, such as investigating and correcting incidents of violence and searching for and controlling the free flow of shanks and drugs in and about the facility, both of which would prevent inmate-on-inmate violence.

303.

Mr. Phillips had a right to be protected from cruel and unusual punishment under the Eighth Amendment right to be free from cruel and unusual punishment and the unreasonable risks of harm.  The Eighth Amendment precludes Defendant Toby and those under her supervision from remaining deliberate indifference toward Mr. Phillips's safety, security, and constitutional rights.

304.

Mr. Phillips's constitutional rights were violated by Defendant Toby's, subordinates as he was attacked by a makeshift shank which was allowed into his cell because of a failure to search and was attacked by a man who was experiencing a violent rage during a methamphetamine high. Further, he was attacked after numerous failures to investigate and correct violent incidents at the prison.

305.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, failures to investigate violence and the free flow of contraband, that put Defendant Toby on notice of the need to take action—yet she failed to do so.

306.

Defendant Toby refused to take action to supervise her staff, to actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of other prisoners, to adequately investigate incidents of violence , and to root out the free flow of makeshift weapons and drugs, which resulted in Mr. Phillips's constitutional deprivations, personal injury, wrongful death, and other harms and damages.

307.

Defendant Toby fostered an unreasonable environment of violence which motivated and encouraged inmates to commit violence against each other and which resulted in Mr. Phillips's constitutional deprivations, personal injury, wrongful death, and other damages.

308.

As a result of Defendant Toby's supervision, Hancock State Prison had customs, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Toby, whereby correctional employees would not conduct investigations into incidents of violence nor correct them as well as not search for and confiscate makeshift weapons and drugs from inmates.

309.

This custom, practice, and course of conduct, which was created and carried out by Defendant Toby, constituted a persistent and wide-spread practice as indicated above.

310.

This custom, practice, and course of conduct, which was created and carried out by Defendant Toby, constituted deliberate indifference to the safety, security, and rights of Mr. Phillips and exposed Mr. Phillips to unreasonable risks of harm as indicated above.

311.

This custom, practice, and course of conduct, which was created and carried out by Defendant Toby, resulted in Defendant Toby's subordinates acting with deliberate indifference to Mr. Phillips's constitutional rights as indicated above.

312.

This custom, practice, and course of conduct, which was created and carried out by Defendant Toby, caused and was a moving force behind Mr. Phillips's constitutional deprivations, personal injury, wrongful death, and other harms and damages because he was attacked by a makeshift shank which was allowed into his cell because of a failure to search and was attacked by a man who was experiencing a violent rage during a methamphetamine high. Further, he was

attacked after numerous failures to investigate and correct violent incidents at the prison.

### 313.

Defendant Toby's above failures amount to deliberate indifference to the safety of inmates, including Mr. Phillips, in violation of the Eighth Amendment.

### 314.

Defendant Toby was subjectively aware of systematic violence at Hancock State Prison as she reviewed numerous incident reports of this violence, she knew of and witnessed numerous emergency transports, she was well aware of the deaths which occurred, received and reviewed reports of the violence, received and reviewed the reports of mass contraband, and was criticized by the public and news agencies for the violence.

### 315.

Defendant Toby is not entitled to qualified immunity for her deliberate indifference and supervisory conduct as described above as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993) and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others.

### 316.

Wherefore, Plaintiffs are entitled to recover under Section 1983 against Defendant Toby.

317.

As a result of the wrongful conduct described above, Mr. Phillips suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, funeral/end of life expenses, violations of constitutionally protected rights, wrongful death, and other general and special damages.

**COUNT VII**
**Section 1983 Claim under Eighth Amendment**
**Cruel and Unusual Punishment --- Supervisory Claim for Uncontrolled**
**Violence at Georgia Prisons including Hancock State Prison caused by**
**Deficient Classifications (Against Defendant Holt in his individual capacity)**

318.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-196 and 218-240 of the instant Complaint as if fully set forth herein verbatim.

319.

At all relevant times herein, Defendant Holt was the Assistant Commissioner of Facilities Division and was responsible for Inmate Classification policies, procedures, and practices.

320.

Defendant Holt had the authority and responsibility for carrying out the policies and procedures related to inmate classifications at Georgia prisons and was

responsible for supervising and making policies and practices for inmate classifications at Georgia prisons.

321.

Defendant Holt is sued for his failures to ensure timely and accurate classification, reclassification and segregation reviews, accurate and complete data in GDC's automated systems and by staff, segregation reviews and counselor meetings, the completion of timely counseling sessions, and the implementation of the agency's own classification timelines and procedures, such as those that mandate classification.

322.

Mr. Phillips had a right to be protected from cruel and unusual punishment under the Eighth Amendment right to be free from cruel and unusual punishment and the unreasonable risks of harm.  The Eighth Amendment precludes Defendant Holt and those under his supervision from remaining deliberate indifference toward Mr. Phillips's safety, security, and constitutional rights.

323.

Mr. Phillips's constitutional rights were violated by Defendant Holt's, subordinates as Inmate Garrison was incorrectly placed in his cell, while both Inmates were in segregated housing and experiencing mental health problems.

Further, Inmate Garrison possessed a violent history and recently stabbed another inmate.

324.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence caused by deficient classifications that put Defendant Holt on notice of the need to take action—yet he failed to do so.

325.

Defendant Holt refused to take action to look into and fix the problems with the GDC classification systems and this resulted in Mr. Phillips's constitutional deprivations, personal injury, wrongful death, and other harms and damages.

326.

As a result of Defendant Holt's supervision, Hancock State Prison and the Georgia Prison System had customs, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Holt, whereby timely and accurate classification, reclassification and segregation reviews were not being completed, inaccurate and incomplete data in GDC's automated systems existed, segregation reviews and counselor meetings were not being conducted, counseling sessions were not being conducted, and the

agency's own classification timelines and procedures, such as those that mandate classification were not being implemented.

327.

These customs, practices, and courses of conduct related to inmate classification, which was created and carried out by Defendant Holt, constituted a persistent and wide-spread practice as indicated above.

328.

These customs, practices, and courses of conduct related to inmate classification, which was created and carried out by Defendant Holt, constituted deliberate indifference to the safety, security, and rights of Mr. Phillips and exposed Mr. Phillips to unreasonable risks of harm as indicated above.

329.

These customs, practices, and courses of conduct related to inmate classification, which was created and carried out by Defendant Holt, resulted in Defendant Holt's subordinates acting with deliberate indifference to Mr. Phillips's constitutional rights as indicated above.

330.

These customs, practices, and courses of conduct related to inmate classification, which was created and carried out by Defendant Holt, caused and was a moving force behind Mr. Phillips's constitutional deprivations, personal

injury, wrongful death, and other harms and damages because he was forced to share a dorm with a violent inmate who recently stabbed another inmate as well as the fact that Mr. Phillips had a long history of segregated housing, involuntary medication, and mental health issues.

331.

Defendant Holt's above failures amount to deliberate indifference to the safety of inmates, including Mr. Phillips, in violation of the Eighth Amendment.

332.

Defendant Holt was subjectively aware of systematic violence at Hancock State Prison as well as the entire prison system under his control as he reviewed numerous incident reports of this violence, reviewed numerous emergency transports, he was well aware of the deaths which occurred, received and reviewed reports of the violence, and was criticized by the public and news agencies for the violence.

333.

Defendant Holt is not entitled to qualified immunity for his deliberate indifference and supervisory conduct as described above as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993) and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others.

334.

Wherefore, Plaintiffs are entitled to recover under Section 1983 against

Defendant Holt.

335.

As a result of the wrongful conduct described above, Mr. Phillips suffered

from permanent injuries, disfiguring injuries, physical and mental pain and

suffering, extreme mental and emotional distress, humiliation, shock, and fright,

medical bills, funeral/end of life expenses, violations of constitutionally protected

rights, wrongful death, and other general and special damages.

**COUNT VIII**
**Section 1983 Claim under Eighth Amendment**
**Cruel and Unusual Punishment --- Supervisory Claim for Uncontrolled**
**Violence at Georgia Prisons including Hancock State Prison caused by a**
**Failure to Maintain Facilities (Against Defendant Clark in his individual**
**capacity)**

336.

Plaintiffs hereby incorporate by reference the allegations set forth in

Paragraphs 1-173 and 197-240 of the instant Complaint as if fully set forth herein

verbatim.

337.

At all relevant times, Defendant Clark was the Director of Engineering &

Construction Services for the Georgia Department of Corrections and was

responsible for management and oversight of the ECS division, which is responsible for the design, construction, and maintenance of the Georgia prison's physical infrastructure.

338.

Defendant Clark is sued for his failures to perform maintenance on Georgia Prisons, which includes Hancock State Prison, in the face of widespread inmate-on-inmate violence, stabbings, and makeshift knives.

339.

Mr. Phillips had a right to be protected from cruel and unusual punishment under the Eighth Amendment right to be free from cruel and unusual punishment and the unreasonable risks of harm. The Eighth Amendment precludes Defendant Clark and those under his supervision from remaining deliberate indifference toward Mr. Phillips's safety, security, and constitutional rights.

340.

Mr. Phillips's constitutional rights were violated by Defendant Clark's subordinates as he was stabbed multiple times by a makeshift knife, which were readily accessible at Hancock State Prison due to the prison's unmaintained infrastructure and facilities.

341.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, a mass makeshift knife problem, and high incidences of stabbings that put Defendant Clark on notice of the need to take action—yet he failed to do so.

342.

Defendant Clark refused to take action to perform maintenance, to actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of other prisoners, and to maintain facilities so that weapons cannot be made from the crumbling infrastructure. This failure to take action resulted in Mr. Phillips's constitutional deprivations, personal injury, wrongful death, and other harms and damages.

343.

As a result of Defendant Clark's supervision, Hancock State Prison and the Georgia Prison System had customs, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Clark, whereby maintenance was ignored and prisoners were able to craft makeshift knives and weapons by taking metal and plastic materials from the walls and utilities and use these weapons to stab and kill other inmates.

344.

This custom, practice, and course of conduct, which was created and carried out by Defendant Clark, constituted a persistent and wide-spread practice as indicated above.

345.

This custom, practice, and course of conduct, which was created and carried out by Defendant Clark, constituted deliberate indifference to the safety, security, and rights of Mr. Phillips and exposed Mr. Phillips to unreasonable risks of harm as indicated above.

346.

This custom, practice, and course of conduct, which was created and carried out by Defendant Clark, resulted in Defendant Clark's subordinates acting with deliberate indifference to Mr. Phillips's constitutional rights as indicated above.

347.

This custom, practice, and course of conduct, which was created and carried out by Defendant Clark, caused and was a moving force behind Mr. Phillips's constitutional deprivations, personal injury, wrongful death, and other harms and damages because Mr. Phillips was stabbed multiple times by a makeshift knife, which were readily accessible at Hancock State Prison due to the prison's unmaintained infrastructure and facilities.

348.

Defendant Clark's above failures amount to deliberate indifference to the safety of inmates, including Mr. Phillips, in violation of the Eighth Amendment.

349.

Defendant Clark was subjectively aware of systematic violence at Hancock State Prison as well as the entire prison system under his control as he reviewed numerous incident reports of this violence, reviewed numerous emergency transports, he was well aware of the deaths which occurred, received and reviewed reports of the violence, and was criticized by the public and news agencies for the violence.

350.

Defendant Clark is not entitled to qualified immunity for his deliberate indifference and supervisory conduct as described above as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993) and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others.

351.

Wherefore, Plaintiffs are entitled to recover under Section 1983 against Defendant Clark.

352.

As a result of the wrongful conduct described above, Mr. Phillips suffered from permanent injuries, disfiguring injuries, physical and mental pain and

suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, funeral/end of life expenses, violations of constitutionally protected rights, wrongful death, and other general and special damages

## COUNT IX
## Wrongful Death for §1983 claims incorporated into federal law under §1988. (Against All Defendants)

### 353.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-240 of the instant Complaint as if fully set forth herein verbatim.

### 354.

Rochar Jones, as Next of Friend of Amanda Jones is the mother and natural guardian of Amanda Jones who is the surviving daughter of Roland Phillips, who died under tragic circumstances on June 28, 2023.

### 355.

Plaintiff Rochar Jones is the natural mother and next of friend of Amanda Jones who is the surviving child of Roland Phillips. Plaintiff Rochar Jones seeks to recover for the wrongful death of Roland Phillips on behalf of his surviving child Amanda Jones.

### 356.

Mr. Phillips was unmarried at the time of his death on June 28, 2023. He was 33 years old at the time of his death.

357.

Mr. Phillips died on June 28, 2023, as a direct result of the constitutional deprivations caused by each of the Defendants. Thus, Plaintiff Rochar Jones, as Next of Friend of Amanda Jones is entitled to recover for the wrongful death of Amanda Jones's father, Mr. Phillips.

358.

Plaintiff Rochar Jones intends to recover for the full value of the life of Roland Phillips, whose death was caused by the constitutional violations described herein.

359.

Wherefore, Plaintiff Rochar Jones, as next of friend of Roland Phillips's surviving child, Amanda Jones, seeks to recover for the full value of Roland Phillips's life under the wrongful death statutes which are incorporated into federal law through 42 U.S.C. §1988.

## COUNT X
## Estate Claims/Damages for Federal Violations (Against All Defendants)

360.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-240 of the instant Complaint as if fully set forth herein verbatim.

361.

As set out above, Mr. Phillips sustained physical and mental pain and suffering, disfigurement, extreme mental distress, and other general damages as a direct result of the acts and omissions which constitute violations of federal law and violations of constitutional rights.

362.

As set out above, Mr. Phillips incurred medical expenses, ambulance expenses, burial/funeral expenses, and other special damages as a direct result of the acts and omissions which constitute violations of federal law and violations of constitutional rights.

363.

As a result of Defendants' wrongful conduct described herein, Mr. Phillips incurred medical and related expenses for his care, treatment, and services prior to and after his death. Mr. Phillips also endured physical and mental pain and suffering as a result of acts and omissions which constitute violations of federal law and violations of constitutional rights prior to his death.

364.

In her capacity as the Administrator of the Estate of Roland Phillips, Plaintiff is entitled to recover all damages to which Mr. Phillips would have been

entitled to had he survived, including personal injury, physical and mental pain and suffering, medical costs, and funeral expenses.

## COUNT XI
## Punitive Damages
### (Against Defendant Holt, individually, Defendant Clark, Individually, Defendant Toby, individually, Defendant Ivey, Individually, Defendant Swint, Individually, Defendant Dixon, Individually, and Defendant Salad, Individually)

365.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-240 of the instant Complaint as if fully set forth herein verbatim.

366.

Defendant Holt's, Defendant Clark's, Defendant Toby's, Defendant Ivey's, Defendant Swint's, Defendant Dixon's, and Defendant Salad's actions showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against said Defendants in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

367.

Defendant Holt's actions in enforcing and employing unconstitutional customs, supervision, and practices related to classification of inmates with knowledge of the horrible consequences, including death, assaults, and violence

which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Holt in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

368.

Defendant Clark's actions in enforcing and employing unconstitutional customs, supervision and practices related to the maintenance of prison facilities with knowledge of the horrible consequences, including death, assaults, and violence which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Clark in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

369.

Defendant Toby's actions in enforcing and employing unconstitutional customs, supervision, and practices related to the free flow of contraband and investigations into violence with knowledge of the horrible consequences,

including death, assaults, and violence which were occurring as a result of these practices and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Toby in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating her conduct.

370.

Defendant Ivey's actions in retaliating against Mr. Phillips as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiffs to recover punitive damages against Defendant Ivey in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

371.

Defendant Ivey's actions in supervising prison staff in the failure to protect Mr. Phillips from violence at the hands of Inmate Garrison as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Ivey in an

amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

372.

Defendant Ivey's actions in showing deliberate indifference to Mr. Phillips's safety and in failing to protect Mr. Phillips from Inmate Garrison as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Ivey in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

373.

Defendant Swint's, or in the alternative Defendant Dixon's, actions in showing deliberate indifference to Mr. Phillips's safety and in failing to protect Mr. Phillips from Inmate Garrison as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Swint, or in the alternative Defendant Dixon, in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating her conduct.

374.

Defendant Salad's actions in showing deliberate indifference to Mr. Phillips's safety and in failing to protect Mr. Philips from Inmate Garrison as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Salad in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

375.

Defendant Holt, Defendant Clark, Defendant Toby, Defendant Ivey, Defendant Swint, Defendant Dixon, and Defendant Salad, acted with the specific intent to cause harm in that said Defendants desired to cause the consequences of their actions and/or knew that the consequences of their actions were substantially certain to result.

376.

Wherefore, Plaintiff is entitled to recover punitive damages against Defendant Holt, Defendant Clark, Defendant Toby, Defendant Ivey, Defendant Swint, Defendant Dixon, and Defendant Salad as determined by the enlightened conscience of impartial jurors.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for damages and request from the Court:

a.  That summons and process issue as required by law;

b.  To allow a trial by jury on all issues so triable;

c.  That judgment issue in favor of Plaintiffs and against Defendants on all counts of Plaintiffs' Complaint;

d.  To award Plaintiffs compensatory damages against all Defendants;

e.  To grant costs of this action, interest, and attorneys' fees per 42 U.S.C. § 1988;

f.  That judgment issue in favor of Plaintiff Rochar Jones on behalf of Amanda Jones as the surviving child of Roland Phillips for the full value of the life of Roland Phillips as determined by the enlightened conscious of a jury;

g.  That judgment issue in favor of Plaintiff in her capacity as the Administrator of the Estate of Rolland Phillips and against Defendants awarding the Plaintiff in said capacity general, special, and compensatory damages, including but not limited to physical and mental pain and suffering, extreme mental distress, medical bills, ,

ambulance expenses, burial/funeral expenses, and other necessary expenses in an amount to be proven at trial;

h.  That judgment issue in favor of Plaintiff in her capacity as the Administrator of the Estate of Roland Phillips and against Defendant Holt, Defendant Clark, Defendant Toby, Defendant Ivey, Defendant Swint, Defendant Dixon, and Defendant Salad awarding Plaintiff in said capacity punitive damages in an amount determined at trial by the enlightened conscience of a fair and impartial jury; and;

i.  To award further relief as the Court deems equitable, proper, and just.

Respectfully submitted this 25th day of June, 2025.

**ERIC J. HERTZ, P.C.**

By:    ***/s/ Alex S. Hertz***
ERIC J. HERTZ
GA State Bar No. 349501
*hertz@hertz-law.com*
ALEX S. HERTZ
Georgia Bar No. 420971
*alex@hertz-law.com*

*Counsel for Plaintiffs*
8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
Tel: (404) 577-8111
Fax: (404) 577-8116